# CASES

ADJUDGED IN

# THE COURT OF CHANCERY

## OF THE STATE OF NEW JERSEY.

### OCTOBER TERM, 1875.

## HAVENS *vs.* BLISS and others.

1. The evidence in this case, *held* to establish a resulting trust.

2. A purchase by a party claiming a resulting trust, of the property in respect to which the claim is made, at a sale under judicial proceedings, subsequent to the original purchase—*held*, under the circumstances, not to have been inconsistent with the claim of ownership.

3. Occupancy of land is equivalent to notice to all persons dealing with the title, of the claim of the occupant.

4. If a tenant has changed his character, by having agreed to purchase the estate, his possession amounts to notice of his equitable title as purchaser.

5. The plea of purchaser for valuable consideration without notice of complainant's title, must aver that the person who conveyed or mortgaged to the defendant was seized in fee, or pretended to be seized in fee, and was in possession, if the conveyance purported an immediate transfer of the possession at the time when he executed the purchase or mortgage deed.

6. Every man purchases at his peril, and is bound to use some reasonable diligence in looking to the title and competency of the seller. It will not answer to rest upon mere reputation or belief, unless the party intends to rely upon his covenants alone.

On final hearing, on pleadings and proofs.

*Mr. G. N. Abeel,* for complainant.

*Mr. Gilbert Collins,* for defendants, Bliss and Slater.

THE CHANCELLOR.

On the 14th of April, 1856, Garret Vreeland and his wife, and Job Smith, and Jane Tuers, widow, conveyed to John Havens, now deceased, a lot of land and premises in Hudson county, for the consideration of $1100. John Havens died on or about the 15th of August, 1857, intestate. From about the time of the conveyance of the property to him, until his death, he, with his wife and child, Peter S. Havens, resided on the property. Since his death, his widow, the complainant, has continued to reside there. In 1870, the defendant, Bliss, obtained a conveyance of the property in fee to himself, from the defendant, William H. Havens and his wife, and the defendants, Mary Wilson and her husband, and one Ann Nebeker and her husband. William H. Havens and Mary Wilson are said to be the children of John Havens by his first wife, the above mentioned Ann Nebeker, from whom he was divorced before his marriage to the complainant. It appears that, about the year 1844, his first wife deserted him, and went to live among the Mormons, and that he was divorced from her by a decree of this court in 1852, and married the complainant in 1854. Bliss brought an action of ejectment on his title, but discontinued it. He then conveyed half of the premises to the defendant, Slater, by deed, without consideration, for the purpose of taking proceedings for a partition of the property. In the suit for partition which he then brought in this court, an issue at law was ordered, which resulted in establishing the validity of the complainant's marriage and the legitimacy of her son Peter. Her bill is filed against Bliss and Slater, and William H. Havens, and their respective wives, Mary Wilson and her husband, and Peter S. Havens; and its object is to establish her right to the property by reason of a resulting trust; she claiming to have purchased the property for herself, and to have paid for it

with her own money, and that the title was taken in her husband's name, without her consent or knowledge.   The bill also prays that, in the event of her failure to establish such trust, she may be decreed to have an equitable lien on the premises, for the purchase money paid by her and her subsequent outlays for the improvement of the property, with interest.   Bliss and Slater have answered, but the other defendants have not.

The evidence in the cause establishes a resulting trust in favor of the complainant.   She testifies that she had $1250, money received by her from England, her own separate property, in the hands of her brother-in-law, David Day, who held it in trust for her ; that her husband was of intemperate habits, and she was desirous of purchasing a small property out of the city of New York, in which they then lived, as an investment for her money, and a home for herself and her child ; that she received her money from her brother-in-law, and deposited $1000 of it in the Butchers' and Drovers' bank in New York, in the name of her husband, she and her brother-in-law going with him to the bank for the purpose ; that she went out to Hudson City to look at the property in question which was for sale ; that she looked at it, and agreed to purchase it at the price of $1100, and paid Job Smith, who was one of the owners, $50 on account, to bind the bargain. She testifies that, after she had paid the $50, her husband, who had not yet seen the property, went with her to look at it, and after he had seen it, was dissatisfied with it, and said he would not live there—that it was a wilderness ; that that evening, at her brother-in-law's house, her husband repeated his determination not to live on the property, and said that she had paid her own money, and might go and live on the property.   She says he insisted that she should go back to Hudson City the next morning, and demand that her money be returned to her.   The next day she went accordingly, and asked that her money should be returned, giving as her reason, the dissatisfaction of her husband.   Mr. Newkirk, the son-in-law of Job Smith, with whom she had the interview, declined to

return the money; and while she was still there, her husband came, and Newkirk upbraided him for discouraging her in her purchase; and she says that her husband and Newkirk then went to the bar of the hotel together, and in a short time came out, and Newkirk told her he would give her a good warranty deed for the property, and she then paid the balance of the money, "giving her purse and all" to her husband, who told her to go home to attend to her child, which had been left alone, and he assured her that she should be justly dealt with, and would have a good warranty deed. She says she then went home, and never saw the deed till, after her husband's death.

Her testimony in regard to the purchase of the property is corroborated by that of her nephews, the Days. Her brother-in-law, their father, is dead. One of them was, at the time of the purchase, about twenty years of age. He swears positively to witnessing, at the request of his father, the payment by the latter to the complainant of $1250, which he held in trust for her; that when she and her husband returned from their visit to the property, the fact that she had paid $50 for a deposit on account of the purchase she had made, was spoken of in the presence of her husband, who then angrily expressed his dissatisfaction with the purchase, and declared that the money she had paid was her own money, and she could do as she pleased, but he would not go there to live; that she could go and live on it, as she had bought it, and even if she did not get her money back, (the $50,) he would not live on the place; that the next day she came over to Hudson City to procure the return of her money, and her husband followed her, and that she came back and said she did not get her money back, and had made the bargain good. Henry H. Newkirk corroborates her also. He says she and her husband came over to his hotel in Hudson City; that they were looking for property to purchase; that the complainant went with his father-in-law, Job Smith, to look at this property; that when they came back, she, or she and her husband, agreed to buy it; that according to his recollection,

she paid him, Newkirk, $50, for which he gave a receipt signed by Job Smith; that they came back and "wanted to get out of it, and wanted to get a part of their money, the $50, back again." He says his impression is that she said she would give $25 of it, as he told her there had been some expenses in employing a surveyor to survey it. He testifies that he thinks Mr. Havens gave as a reason for not wanting to come there, that it was out in the country, an out-of-the-way place; that Mr. Havens did not have much to say about it; that Mrs. Havens did most of the business; that Mr. Havens said Mrs. Havens might do as she pleased, in respect to buying the property. Her positive testimony, thus corroborated, is not overthrown by the evidence adduced by the defendants, Bliss and Slater, which consists in part of the testimony of two witnesses, Jacob Newkirk and John Anderson, the former of whom testifies that John Havens told him, while he, Havens, was in possession of the property, that he paid for it out of the proceeds of the sale of some land in Hudson City, which he had sold for $3000, in the fall of 1855. The objection to the competency of this testimony, and the like testimony given by Thompson of a similar declaration by Havens to him, is well taken. The latter testifies also, that in the last year of John Havens' life he heard him say to his wife, in the course of an angry altercation between them, "I bought this property with my own money—you have your thirds in it, that's all," to which he says she made no reply. He further swears that he heard John Havens state, in the complainant's presence, in their house, "when they had spats," about a year or two before his death, that the money he paid for the property he got from the property above mentioned, sold by him in the fall of 1855.

It is apparent, according to these statements of this witness, that there must have been a claim to the ownership of the property, on the part of the complainant, to have called forth these statements from her husband on these occasions, for, it is to be remembered, that the title was in her husband. Nor

is this left to inference merely, for this witness says : " When they got in these spats they called each other names. She said she paid for the property, but not always." So that, according to the testimony of the witness, she claimed, during her husband's lifetime, that she bought the property, and paid for it with her own money, and on that ground asserted her ownership, in altercations which took place between them. This witness appears to be unreliable at best, and he certainly is mistaken in his recollection, when he says he is certain that the complainant was not present when the bargain for the property was made with Smith, and that the bargain was made by John Havens with Smith. The defendants, Bliss and Slater, rely also on the fact that John Havens appears to have sold a piece of land in Hudson City, in the fall of 1855, for $3000, according to the deed, and the fact that the deed for the property in question in this suit was taken in his name ; that $900 of the money which the complainant swears she paid for the property, stood in her husband's name in the bank; and the fact that, in 1870, she bought the property at a sale made by the guardian of her son, in pursuance of a decree of the Orphans Court of Hudson county, directing the guardian to sell the property, which was then represented, in the proceedings, to belong to Peter. The complainant swears, (and there is some corroboration of her testimony on that point,) that she did not know that the deed had been taken in the name of her husband until 1866, when reference was made to it, to ascertain the boundaries of the land, on the occasion of a question between her and some persons who were felling trees on what she claimed to be her land. That the money was deposited in her husband's name she states in her testimony, and states, also, the circumstances under which the deposit was made.

Bliss and Slater claim, in their answer, that her purchase at the guardian's sale was inconsistent with her claim of ownership. But the circumstances furnish a sufficient explanation of her action. She swears that she never heard, until after Bliss brought the action of ejectment against her, that

her husband had any children by his first wife, and she testifies that he told her that he had none. It appears that when she discovered that the title had been taken in the name of her husband, she was disturbed about it, and contemplated proceedings to obtain the legal title, but abandoned the idea on the consideration that the title was in her son. When it became desirable to raise money to put her son into some business, the sale of part of the property for the purpose was suggested to her, and proceedings were taken accordingly, and at the guardian's sale, to prevent sacrifice, she bid in the property and took a deed for it. At this time she knew nothing of any adverse claim to the property. As to the proceeds of the property sold by her husband, in the fall of 1855, there is no evidence, except the testimony of the defendant's witnesses, Jacob Newkirk and John Anderson, as to the statements of her husband on the subject, that any part of them was used in the purchase of the property in question. It appears that her husband was exceedingly intemperate in his habits, and not only recklessly squandered his money, but in his intoxication, met heavy losses; that just before they moved into this state to live on the property in question in this suit, he claimed to have been robbed, in a saloon, of $600, and at another time he walked off the dock into the river, when intoxicated, and alleged that he had then lost a considerable amount of money. One of the witnesses says he saw him "crying about something valuable he had lost" on that occasion. His habits were such that the complainant was advised, by her friends, to secure her own money by the purchase of property, as a home for herself, with it. That he was averse to the purchase of the property in question in this suit, merely because he did not want to live there, is clearly shown. It is proved that she herself examined the property, and negotiated the purchase before he saw it; that she had the money in her own hands to pay for it, and paid for it with that money; and went alone, with the money in her possession, on the second day, to withdraw from the bargain, or to confirm it, and pay the balance of the purchase

money, as she should see fit, and that he recognized the property as being purchased with her money. She has improved the property with her own money, and has had exclusive possession of it since her husband's death, in 1857.

But it is insisted that Bliss and Slater are *bona fide* purchasers for valuable consideration, without notice of the claim now set up by the complainant. It is urged, on their behalf, that the possession of the complainant was, inasmuch as the legal title was of record in the name of her deceased husband, notice only of her claim to quarantine as his widow. It is true, there are to be found cases in this country in which the notice which possession gives is confined to a known title under which the possessor holds, but the rule is, and I see nothing to take this case out of its operation, that the occupancy of land is equivalent to notice, to all persons dealing with the title, of the claim of the occupant. If a tenant has even changed his character by having agreed to purchase the estate, his possession amounts to notice of his equitable title as purchaser. 2 *Sugd. on Vend.*, (11th Am. ed.) 543; *Daniels* v. *Davison*, 16 *Ves.* 254. In *Baldwin* v. *Johnson*, *Saxt.* 441, the language of Lord Rosslyn, in *Taylor* v. *Stibbert*, 2 *Ves., jr.*, 440, is quoted with approbation, and applied to a case where a mortgagee had taken her mortgage on land, the legal title to which was in the mortgagor, but was subject to a trust in favor of another person, of which the mortgagee had no knowledge or information. The tenants of the mortgagor were in actual possession of the property. The court held her bound to inquire of them as to the title. The language of Lord Rosslyn, above referred to, is: "It was sufficient to put the purchaser upon inquiry, that he was informed the estate was not in the *actual* possession of the person with whom he contracted; that he could not transfer the ownership and possession at the same time; that there were interests, as to the extent and terms of which it was his duty to inquire."

In the case before me, the person in possession had no record title. Her right, as the widow of John Havens, was by operation of law. She was not in possession of a

part of the premises, merely, which had been set off to her as her dower, but of the whole, and she exercised full and complete ownership over the whole. She had been thus in possession from 1857, a period of thirteen years, when the deed to Bliss was made. Slater, who negotiated the purchase of the property, and who now holds a conveyance for one-half of it from Bliss, for which he has not paid, and is not to pay anything, and, as Bliss admits, is entitled to a third of the net profits of the speculation, knew of the complainant's possession at the time of the purchase, and Bliss himself had lived in Hudson City for four years before that time, and knew of her occupancy. The persons of whom Bliss purchased, had never had any possession of the property, and, for aught that appears, had never seen it. The price alleged to have been paid, is $1200. Bliss admits that the property is worth $8000. He knew that his claim to it would be resisted. He says he thought he was going to make money out of it ; that he expected to be at the trouble and expense of ejecting the present occupants, and expected to have a law suit ; that he thought he was buying the land with the chances of a law suit, and that he had no counsel to investigate the title before he bought the property. Those from whom Bliss purchased, not only never had possession, but, as far as appears, they never claimed possession or title. He never saw them, nor did he have any communication with them, except through Slater, whom he recognizes as having been his agent, and Slater appears to have dealt with them through the Mormon agent in New York. The price he paid is, at his own estimate, only about one-seventh of the value. He, admittedly, knowing that the complainant was in absolute and complete occupancy of the property, without any inquiry of her as to her title, but assuming, as he admits he did, that she had none whatever, negotiated through Slater with the persons (living in Utah) from whom he obtained his deed. His purchase was avowedly a mere speculation. He knew that those who conveyed to him were not in possession of that which their deed purported to convey to him, and he antici-

pated the necessity of a law suit against the complainant to obtain possession. The plea of purchaser for valuable consideration, without notice of complainant's title, must aver that the person who conveyed or mortgaged to the defendant, was seized in fee, or pretended to be seized in fee, and was in possession, if the conveyance purported an immediate tranfer of the possession at the time when he executed the purchase or mortgage deed. *Mitf. Pl.*, by Jeremy, 275; *Story's Eq. Pl.*, § 809. In this case, Bliss not only did not avail himself of the opportunities of information which he possessed, but willfully refrained from doing so, for he intended, by means of his purchase, to deprive the complainant not merely of all of the property except her dower, but of the whole property ; he, as before remarked, assuming, without inquiry, that she had no lawful or rightful claim whatever. "Every man," says the court, in Baldwin *v.* Johnson, "purchases at his peril, and is bound to use some reasonable diligence in looking to the title and competency of the seller. It will not answer to rest upon mere reputation or belief, unless the party intends to rely upon his covenants alone."

The complainant is entitled to a decree declaring that the legal title to the premises in question in this suit is held in trust for her, and that the holders of such title convey the property to her accordingly.